IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGEL SANDOVAL RIOS,<br><br><br>            Plaintiff,<br><br>      vs.<br><br>CITY OF FRESNO, et al.,<br><br><br>            Defendant.<br>_____ | No. CV-F-05-644 OWW/SMS<br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br>(Doc. 31) AND SCHEDULING<br>PRETRIAL CONFERENCE FOR<br>MONDAY, NOVEMBER 20, 2006 AT<br>11:00 A.M. IN COURTROOM 3 |

Angel Sandoval Rios is proceeding against the City of Fresno, Fresno Police Officers Alfred Campos and Ron Manning pursuant to a Second Amended Complaint.[1]  The Second Amended Complaint arises out of the detention, tasering, arrest and prosecution of plaintiff.

The First Cause of Action is captioned for violation of 42 U.S.C. § 1983 and alleges in pertinent part:

---

[1]The Second Amended Complaint also names Does 1-100 as defendants.  Because no defendants have been substituted for the Doe defendants, the Doe defendants are dismissed.

1

38.   Defendants ... and each of them, without legal justification, willfully, maliciously, and intentionally illegally arrested Plaintiff, by, including but not limited to, unlawfully detaining and arresting Plaintiff ... This illegal arrest and prosecution is in violation of 42 U.S.C. § 1983.

39.   The unlawful and illegal arrest and prosecution ... was without just and legal cause, thereby violating Plaintiff's right under ... the Fourth and Fourteenth Amendment, and his right under the Constitution of the State of California. Said conduct also constitutes a violation of California Civil Code § 43, § 51.7 and § 52.1.

40.   In perpetrating said unlawful and illegal arrest and prosecution, Defendant[s] ... and each of them, perpetrated and caused to happen the malicious prosecution of Plaintiff.

...

42.   As a further and direct result of the above-described acts, Plaintiff was deprived of the rights and immunities secured to him under the Constitution of the United States ... including, but not limited to his right under the Fourth and Fourteenth Amendments to be secured in her [sic] person, to be free from summary punishment without due process, and to equal protection of the laws.

43.   Defendant City of Fresno and DOE ONE, the supervisory officers or agents of the CITY OF FRESNO, are directly liable and responsible for the acts of Defendants CAMPOS and MANNING, because Defendant CAMPOS took the action of tazering Plaintiff pursuant to governmental custom.

44.   Plaintiff alleges that it is the custom of Fresno Police Officers, including Defendant Campos, to resort to the use of a tazer gun, even when the totality of the circumstances do not warrant said use.

45.   Plaintiff also alleges that Fresno

2

Police Officers including Defendant Campos, resort to the use of a tazer gun, when force is applied, in nearly half of the reported incidences involving use of force.  The use of the tazer guns is by far the most commonly used instrument involved in the use of force.

46.  Plaintiff further alleges that Defendants CAMPOS and MANNING conspired with one another to enter into an agreement with the intent to commit wrongful acts: violations of the Fourth Amendment to the United States Constitution, Article One, Sections One and Seven of the California Constitution, and California Civil Code ... § 43 and § 52.1.  Defendants MANNING, CAMPOS, CITY OF FRESNO, and each of them, committed wrongful acts in furtherance of the conspiracy, causing Plaintiff to sustain injury and damages.  Plaintiff ... further alleges that the act or acts of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all the conspirators.  The acts in furtherance of the conspiracy as set forth herein in this FIRST CAUSE OF ACTION [sic].

47.  Defendants CAMPOS and MANNING conspired with one another to deprive Plaintiff of his right to be free of unreasonable seizures under the Fourth Amendment .. and to be free of deprivation of life and liberty under the Fourteenth Amendment ..., Article One, Sections One and Seven of the California Constitution, and California Civil Code ... § 43 and § 52.1.

The Second Cause of Action is captioned "false arrest and imprisonment" and alleges that defendants arrested plaintiff on March 20, 2004 "without a warrant, without probable cause and without any legal justification"; that the warrantless false arrest and false imprisonment "was in violation of Plaintiff's right to be free of an unreasonable seizure under the Fourth Amendment ... and to be free of deprivation of life and liberty

3

under the Fourteenth Amendment, Article One, Sections One and Seven of the California Constitution, and California Civil Code ... § 43 and § 52.1"; and that defendants Manning and Campos "conspired with one another to enter into an agreement with the intent to commit [the] wrongful acts".

The Third Cause of Action is captioned "interference with civil rights" under the Tom Banes Civil Rights Act alleging that, under California Civil Code §§ 43, 51 and 52.1, plaintiff is entitled "to equal protection of the laws, substantive and procedural due process as stated in the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and California Constitution", and that plaintiff "was deprived of liberty, substantive and procedural due process" as a result of the conduct of defendants alleged in the First and Second Causes of Action.

The Fourth Cause of Action is for intentional infliction of emotional distress.

The Fifth Cause of Action is captioned "negligence per se" and alleges that defendants "owed a duty of care to Plaintiff, not to falsely arrest and imprison him as Set forth in the Fourth Amendment ..., Article One, Sections One and Seven of the California Constitution, and California Civil Code ... § 43 and § 52.1" and that the alleged conduct of defendants "constitutes negligence per se ... in that Defendants ... breached the statutory standards set forth" in these constitutional and statutory provisions.

4

1    The Sixth Cause of Action is for negligent infliction of
2  emotional distress and negligence.  The Seventh Cause of Action
3  is for assault and battery, alleging that "Defendants CAMPOS and
4  MANNING, and each of them, illegally and without legal
5  justification tackled, assaulted, shot Plaintiff with a tazer
6  gun, and otherwise used excessive force upon Plaintiff."  The
7  Eighth Cause of Action is for negligence, alleging that Manning
8  and Campos "negligently, carelessly and unlawfully attempted to
9  restrain Plaintiff by use of excessive force by shooting
10 Plaintiff with a tazer gun"; that Manning and Campos "failed to
11 exercise reasonable care to prevent the injuries from occurring
12 by utilizing excessive force without justification"; and that the
13 City of Fresno "was negligent in the training of the police
14 officers in that it does not require training of the police
15 officers in the use of a tazer gun."

16    Defendants move for summary judgment or summary adjudication
17 with respect to each of the causes of action alleged in the
18 Second Amended Complaint.[2]

19

20    [2]The motion for summary judgment, filed on August 4, 2006, was
   noticed for hearing on September 25, 2006.  Pursuant to Rule 78-
21 230(c), Local Rules of Practice, plaintiff's opposition should have
   been filed on or before September 11, 2006.  Plaintiff's response
22 to defendants' statement of undisputed facts and declarations and
   exhibits in opposition to the motion were not filed until
   September 14, 2006.  Plaintiff's memorandum of points and
23 authorities in opposition to defendants' motion was not filed until
   September 18, 2006.  The untimely filing of plaintiff's opposition
24 necessitated continuance of oral argument.  This is not the first
   time in this action that plaintiff's counsel has failed to comply
25 with Rule 78-230.  In connection with defendants' motion to
   dismiss, plaintiff's opposition should have been filed on June 13,
26 2006 but was not filed until June 16 at 4:15 p.m.  Although Judge

1        **A.   <u>Governing Standards</u>**.

2        Summary judgment is proper when it is shown that there

3   exists "no genuine issue as to any material fact and that the

4   moving party is entitled to judgment as a matter of law."

5   Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an

6   element of a claim or a defense, the existence of which may

7   affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v.*

8   *Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th

9   Cir.1987).  Materiality is determined by the substantive law

10  governing a claim or a defense.  *Id*.  The evidence and all

11  inferences drawn from it must be construed in the light most

12  favorable to the nonmoving party.  *Id*.

13       The initial burden in a motion for summary judgment is on

14  the moving party.  The moving party satisfies this initial burden

15  by identifying the parts of the materials on file it believes

16  demonstrate an "absence of evidence to support the non-moving

17  ───────────────

18  Coyle considered the untimely opposition in resolving the motion to
    dismiss, he specifically noted in the July 26, 2006 Order resolving
19  the motion to dismiss: "[P]laintiff is advised that it is his
    obligation to timely comply with court orders, the Federal Rules of
20  Civil Procedure, and the Local Rules of Practice.  Failure to do so
    may result in the imposition of sanctions, including the sanction
21  of dismissal."  Plaintiff's counsel is again warned that he must
    timely comply with court orders, the Federal Rules of Civil
22  Procedure, and the Local Rules of Practice.  Continued failure to
    do so may result in the imposition of sanctions, including the
23  sanction of dismissal.
         In addition, plaintiff's opposition refers to citations to
24  deposition testimony which, in certain instances, are not included
    with the excerpts of deposition testimony attached to the Mr.
25  Ruiz's declaration and a copy of which has not been lodged with the
    court as required by Rules 5-133(j) and 56-260(b) and (d), Local
26  Rules of Practice.

                                    6

1  party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

2  (1986).  The burden then shifts to the nonmoving party to defeat

3  summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving

4  party "may not rely on the mere allegations in the pleadings in

5  order to preclude summary judgment," but must set forth by

6  affidavit or other appropriate evidence "specific facts showing

7  there is a genuine issue for trial."  *Id.*  The nonmoving party

8  may not simply state that it will discredit the moving party's

9  evidence at trial; it must produce at least some "significant

10 probative evidence tending to support the complaint."  *Id.*  The

11 question to be resolved is not whether the "evidence unmistakably

12 favors one side or the other, but whether a fair-minded jury

13 could return a verdict for the plaintiff on the evidence

14 presented."  *United States ex rel. Anderson v. N. Telecom, Inc.*,

15 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the

16 "mere existence of a scintilla of evidence in support of the

17 plaintiff's position"; there must be "evidence on which the jury

18 could reasonably find for the plaintiff."  *Id.*  The more

19 implausible the claim or defense asserted by the nonmoving party,

20 the more persuasive its evidence must be to avoid summary

21 judgment."  *Id.*

22     **B.  Defendants' Statement of Undisputed Facts**.

23     In moving for summary judgment, defendants set forth the

24 following facts as undisputed.  Plaintiff accepts these facts as

25 undisputed except where noted and discussed in this memorandum.

26     UMF 1.  On March 20, 2004, Officer Alfred Campos and Officer

7

Ron Manning were partners working patrol on the swing shift.  At approximately 7:56 p.m., Officers Campos and Manning were parked in the parking lot of a 7/11 store on Fresno and McKinley writing a report when they were approached by a citizen who advised there was a bus running people off the road.  The officers later learned that the person who approached them was Charlie Roberts.

UMF 2.  Mr. Roberts had previously called 911, while he was driving north on highway 41, and reported observing a bus driving recklessly.  He specifically reported that he noticed a bus approaching from behind in the left lane as he was traveling northbound on highway 41, that the bus was traveling a little faster than he was driving and passed him, that, as the bus approached within ten feet behind the vehicle in front of it in the same lane, the bus began to flash its lights; that the vehicle merged into Mr. Roberts' lane to get out of the way; that a little further north, the bus, without activating its signal turning light, tried to merge into Mr. Roberts' lane where cars were, but immediately maneuvered back into its lane.[3]

UMF 3.  As Mr. Roberts was speaking with the dispatch, he saw the bus move over into the middle law again, this time merging over the lane dividers without using its turn signal, causing the four cars in Mr. Roberts' lane to slow down and move

_____

[3]Plaintiff attempts to dispute these facts by referring to deposition testimony from some of the passengers that he was driving in a safe manner.  However, the fact involved is not whether plaintiff was driving in a safe manner but what Mr. Roberts told 911 and what was reported to the officers.

1  towards the shoulder, and reported this to dispatch.[4]

2  <u>UMF 4</u>.  The bus then exited off highway 41 at the McKinley

3  exit, slowed down and stopped at the bottom of the exit ramp.

4  Mr. Roberts also exited and followed the bus.[5]

5  <u>UMF No. 5</u>.  As the bus approached Fresno Street, Mr. Roberts

6  saw a patrol car in a 7/11 parking lot.  Mr. Roberts pulled into

7  the parking lot and reported to the officers that the bus was

8  driving erratically and almost ran other cars off the highway and

9  that the bus had been speeding.  Mr. Roberts pointed the bus out

10 to the officers, which was at the intersection of Fresno and

11 McKinley getting ready to turn southbound onto McKinley.[6]

12 <u>UMF No. 6</u>.  The officers immediately pursued the bus.

13 Officer Campos activated the patrol lights on Fresno Street as

14 the bus turned into the San Joaquin Memorial High School parking

15 lot.  The bus failed to yield and continued down the road for

16 about a quarter of a mile before it stopped.  When the bus

17 stopped, the officers approached it.

18   Plaintiff disputes these facts only to the extent that

19

20 [4]Again, plaintiff disputes this fact, referring to deposition
   testimony from some of the passengers on the bus to support his
21 contention that he was driving in a safe manner.  The fact involved
   is not whether plaintiff was driving in a safe manner but what Mr.
22 Roberts told 911 and what the officers were told.
   [5]Plaintiff does not dispute this fact, stating only that he
23 does not know whether or not Mr. Roberts exited and followed the
   bus.   However, Mr. Roberts' testimony that he did so is
24 uncontradicted.
   [6]Plaintiff does not dispute this fact, stating only that he
25 does not know what exactly Mr. Roberts said to the officers.
   However, what Mr. Roberts said to the officers is in the record and
26 is uncontradicted.

9

1  "yielded 75 feet after seeing the patrol lights."  Therefore, the

2  only dispute is the number of feet the bus traveled after the

3  officers put on the patrol lights.

4      UMF No. 7.  As the officers approached the bus, Angel Rios

5  stepped out and started to open the luggage compartments.  The

6  officers approached and Officer Campos asked Mr. Rios for his

7  driver's license.  Officer Campos made this request several times

8  but Mr. Rios kept moving around the luggage compartment as if the

9  request had not been made.  During the time the officers were

10 trying to talk to Mr. Rios he was getting luggage from the

11 compartment, despite their requests that he stop and speak with

12 them.  Mr. Rios seemed to the officers to be very preoccupied

13 with getting the luggage out of the compartment.

14     Plaintiff disputes this fact, referring to his deposition

15 testimony that his license was in his case in the luggage

16 compartment of the bus and that he was trying to get it to show

17 to the officers.

18     UMF No. 8.  At one point Mr. Rios asked the officers why

19 they stopped him; he was told that someone reported him for

20 making unsafe lane changes.  Mr. Rios demanded that the reporting

21 person be brought to the scene.

22     UMF No. 9.  Mr. Rios finally handed Officer Campos a renewal

23 application for a class A driver's license.  When questioned

24 about the type of license he had, Mr. Rios told the officers "you

25

26

10

1   should know, your are the police."[7]

2   <u>UMF No. 10</u>.  Mr. Rios admits that he was frustrated by this

3   encounter.

4   <u>UMF No. 11</u>.  The officers' perception was that Mr. Rios was

5   not only frustrated, but appeared to be angry and

6   confrontational.[8]

7   <u>UMF No. 12</u>.  In order to get Mr. Rios' full attention,

8   and because the noise from the bus made it difficult to hear, the

9   officers asked Mr. Rios to step away from the bus so they could

10  proceed with their investigation.

11  Plaintiff disputes this fact only as to the term "away",

12  stating that the engine was in the rear of the bus and that

13  defendants moved him to the rear of the bus where it was much

14  louder and more difficult to hear.

15  <u>UMF No. 13</u>.  The officers escorted Mr. Rios to the patrol

16  car parked behind and off to the right of the bus.  Mr. Rios

17  seemed to calm down momentarily but then began to clench his

18  hands into a fist position and seemed very upset.  The officers

19  believed, based on his demeanor, that Mr. Rios was possibly

20  preparing for a physical confrontation.  The officers then

21  decided that it would be best to move Mr. Rios away from the

22  vehicle and have him sit on a nearby curb in order to reduce

23  ─────────────────

24      [7]Although plaintiff attempts to dispute this fact by referring
    to his deposition testimony, the testimony referred to does not
    contradict UMF No. 9.

25      [8]Plaintiff disputes this fact, stating that he "will not
    speculate as to what the Defendants' perception was of him."

26  However, the officers may testify as to their perceptions.

1  officer safety concerns and to de-escalate the situation.[9]

2      UMF No. 14. Mr. Rios was asked several times to sit on the

3  nearby curb.  He refused, telling the officers that he did not

4  have to listen to them.

5      Plaintiff did not testify in his deposition that he told the

6  officers that he did not have to listen to them.  Defendant

7  officers aver in their declarations that plaintiff made this

8  statement.  However, in his deposition plaintiff testified that

9  he told the officers "I was driving since San Diego", that "I

10 need to straighten my legs", that "If you don't mind, I can

11 stand", that "There ain't no place to sit down", that "I'm not

12 going to sit down on the floor", and that, after the officers

13 again told him to sit down, he said "I don't want to".

14     UMF No. 15.  At that point, the officers had not yet had the

15 opportunity to check to see if Mr. Rios had any outstanding

16 warrants, or was on probation or parole.  Nor had they had the

17 opportunity to see if he had any weapons on him.[10]

18 _____

19      [9]Plaintiff disputes this fact as to "clenching his hands into
   a fist position and seemed very agitated."  Plaintiff asserts that
20 it was the defendants who were belligerent and/or agitated.  In so
   asserting, referring to the deposition testimony of bus passenger
21 Betty Gerardin.  Ms. Gerardin testified that she thought the
   officers were very belligerent when Mr. Rios was opening the
22 luggage compartment because they were yelling at him.  Plaintiff
   also refers to another portion of Ms. Gerardin's deposition but
23 does not include the excerpt and has not lodged Ms. Gerardin's
   deposition.  Ms. Gerardin's deposition testimony provided by
24 plaintiff is not relevant to dispute UMF No. 13 because she is
   referring to an earlier time.
25      [10]Plaintiff disputes this fact, stating: "At any time prior to
   the tasing, Defendants could have conducted a pat down of
26 Plaintiff."  Plaintiff's assertion is irrelevant to the fact being
   asserted, i.e., that at the time plaintiff was told to sit down on

12

UMF No. 16.  The officers had no idea how many people were on the bus, and whether or not the people on the bus might be confrontational with the officers.  Their objective was to gain control of the situation as quickly as possible.[11]

UMF No. 17.  Because Mr. Rios refused to follow the officers' lawful commands to sit down, he was told that he would be arrested if he did not cooperate.  He still refused to sit down on the curb as the officers directed and when told he would be arrested, said "go for it."

UMF No. 18.  Officer Campos then attempted to take hold of Mr. Rios' arm in an attempt to take him into custody.  Mr. Rios pulled away and brought his arms in front of him in an attempt to avoid being handcuffed.  Officer Manning then grabbed his other arm and struggled with Mr. Rios.[12]

UMF No. 19.  At that point Officer Campos stepped back

the curb and did not comply, the officers had not had the opportunity to check him out for warrants or weapons.

[11]Plaintiff contends that defendants' objective as to punish and inflict pain on plaintiff, antagonizing him along the way.  In so asserting, plaintiff relies on the deposition testimony of passenger Gerardin.  However, the excerpts of Ms. Gerardin's testimony provided by plaintiff do not dispute UMF No. 16.

[12]Plaintiff disputes this fact, stating "See Exhibit D attached to the Declaration of Eddie Ruiz, Deposition of Angel Rios, P. 70, l 16-22."  However, Exhibit D is excerpts of the deposition testimony of passenger Gerardin.  Exhibit A is excerpts of Mr. Rios' deposition testimony, which excerpt does not include page 70.  Defendants, however, lodged plaintiff's deposition.  Plaintiff testified that he was not asked to put his hands behind his back to be arrested and that, when Officer Manning grabbed plaintiff's right arm, plaintiff was not trying to pull it away from Officer Manning and that, because it was hurting, plaintiff told Officer Manning, "you don't have to use force."

13

1  and deployed the taser.  Mr. Rios fell to the ground and was
2  taken into custody without further incident.

3          UMF No. 20.  Mr. Rios was criminally prosecuted on the
4  charge of resisting arrest.  The decision to prosecute was an
5  independent decision made by prosecutor Nathan Lane of the Fresno
6  County District Attorney's Office.

7      UMF No. 21.  The authority that governs the training of law
8  enforcement officers in California is Peace Officer Standards and
9  Training (P.O.S.T.).[13]

10     UMF No. 22.  Prior to this incident, Officer Campos was
11 trained in the use of the taser in accordance with P.O.S.T.
12 requirements.  Additionally, at the time of the incident, Officer
13 Campos had not only met, but exceeded, P.O.S.T. training
14 requirements.  Officer Manning has also exceeded P.O.S.T.
15 training requirements.

16     UMF No. 23.  The Fresno Police Department's use of force
17 policy in effect at the time of this incident was consistent with
18 state and federal standards.  The Fresno Police Department's
19 adaptation of the taser system and the controlling policy
20 statements concerning its proper use is consistent with other law
21 enforcement agencies across the County, including those at the

22

23

24     [13]Plaintiff asserts that he cannot dispute this fact because
   "[n]o such authority has been provided to Plaintiff."  California
   Penal Code § 13500 *et seq.* governs the Commission on Peace Officer
25 Standards and Training (POST).  The standards and training for
   peace officers in California is set forth by statute and
26 regulation.

1  federal, state and local levels.[14]

2       UMF No. 24.  The officers were not only authorized to

3  stop and briefly detain Mr. Rios to investigate; they had a

4  responsibility to investigate the report of a reckless bus

5  driver.

6       UMF No. 25.  Mr. Rios had a responsibility to cooperate

7  with the officers; and it was reasonable for the officers to

8  expect him to cooperate.

9       UMF No. 26.  The officers were reasonable in electing

10 to move plaintiff away from the noise of the bus.  This technique

11 is consistent with modern police procedures and is the

12 recommended practice in such circumstances.[15]

13    UMF No. 27.  Mr. Rios was criminally prosecuted on the

14 charge of resisting arrest (PC 148(a)).  A criminal trial began

15 on October 21, 2004.  On October 26, 2004, the jury advised that

16 they were hung on this charge and a mistrial was declared.  The

17 case was ultimately dismissed in July, 2005 when there were no

18 new filings.

19    UMF No. 28.  According to Mr. Rios, Officer Manning did not

20

21    [14]Plaintiff contends that there is no such specific policy, nor
a controlling policy statement with regard to the proper use of the

22 taser.  Plaintiff refers to "Exhibit G, Deposition of Alfred
Campos, P. 16, L 17-25, P. 17, L.1."  Exhibit G is an excerpt of

23 the deposition of Myrl Stebens and no excerpt of the deposition of
Alfred Campos is attached to Mr. Ruiz's declaration in opposition

24 to the motion.

25    [15]Plaintiff disputes this fact only as to the term "away",
stating that the engine was in the rear of the bus and that

26 defendants moved him to the rear of the bus where it was much
louder and more difficult to hear.

1  make any statements to Officer Campos during this encounter.

2  　　UMF No. 29.   The taser represents a modern alternative to

3  other force options such as striking techniques, kicks, impact

4  weapons, police service dogs and even deadly force in certain

5  circumstances.

6  　　UMF No. 30.   The taser fires two probes up to a distance of

7  twenty-one feet.  The probes are connected to the taser by high-

8  voltage insulated wire.  When the probes make contact with the

9  target, the taser transmits electrical pulses along the wires and

10 into the body.

11 　　UMF No. 31.  When properly deployed, the taser has a proven

12 ability to rapidly gain control of a resisting subject with

13 minimum exposure to serious injuries.  The ability to quickly

14 control a resisting subject reduces the probability of a

15 protracted struggle and associated risks to the subject and the

16 arresting officers.  It is less injurious than the traditional

17 police baton.[16]

18 _____

19 　　[16]Plaintiff disputes this fact, referring to the deposition
   testimony of Myrl Stebens. the pages of deposition testimony

20 referred to are not attached to Mr. Ruiz's declaration.  However,
   defendants lodged Stebens' deposition.  In pertinent part, Stebens

21 testified:

22 　　　　There was absolutely no need, in my opinion,
   　　　　based on the position of Mr. Rios, with two

23 　　　　trained officers in the position that they
   　　　　were - one to the left, and one to the right

24 　　　　rear - that this taser had to be employed.
   　　　　They could - should have been able to take him

25 　　　　down or gain control of him without any other
   　　　　unnecessary use of the taser or even an impact

26 　　　　weapon. [DT 105:23 - 106:4]

16

1    UMF No. 32.  The officers were justified in using force on

2    plaintiff when he resisted the arrest.  According to plaintiff's

3    force expert, the officers could have physically taken Mr. Rios

4    to the ground; they could have used chemical agents such as OC

5    (pepper) spray, or they could have used a medium level strike

6    with a baton.

7    UMF No. 33.  The Fresno Police Department's use of force

8    policy authorized the use of physical force to effect an arrest,

9    prevent an escape, overcome resistance or defend themselves and

10   others from injury.  The type and degree of force used is that

11   which is reasonably necessary to effectively bring an incident

12   under control.  The use of the taser is an authorized force

13   application provided the officer has been trained in its use.

14   UMF No. 34.  The Fresno Police Department's development of

15   the taser as a viable alternative to more traditional and

16   injurious force options and the controlling policies regarding

17   its proper use, are consistent with other local, state, and

18   federal law enforcement agencies across the country.[17]

19   UMF No. 35.  Neither Officer Campos nor Officer Manning

20   harbored any animus, hostility, or malice towards Mr. Rios.[18]

21   _____

Stebens' deposition testimony in no way contradicts UMF No. 31.

22       [17]Plaintiff disputes this fact, referring to the deposition
testimony of Myrl Stebens quoted above in footnote 16 to UMF No.

23   31.  The quoted portion of Stebens' deposition in no way
contradicts the fact set forth.

24       [18]Plaintiff disputes this fact, referring to the deposition
testimony of passenger Gerardin, wherein she testified that the

25   officers were "yelling" at plaintiff as he was opening the luggage
compartment of the bus.  Plaintiff also refers to another page of

26   Ms. Gerardin's deposition which is not included in the excerpt

1    UMF No. 36.  The officers did not use excessive or

2 unnecessary force.[19]

3    UMF No. 37.  Plaintiff did not suffer severe emotional

4 distress as a result of this incident.  His emotional injury

5 consists of alleged memory loss; reacting by shaking if someone

6 mentioned the taser; and being jumpy at night.  The memory loss

7 consists of not being able to remember a number on one occasion.

8 The jumpiness at night resulted in plaintiff's taking sleeping

9 pills for two weeks.[20]

10    UMF No. 38.  There has been no evidence presented during

11 discovery that Mr. Rios received treatment for any emotional

12 distress he allegedly suffered.[21]

---

14 attached to Mr. Ruiz's declaration.  Ms. Gerardin's testimony that
   the officers were "yelling" at Mr. Rios as he was opening the
15 luggage compartment does not suffices to raise a material question
   of fact that either of the officers animus, hostility or malice
16 toward plaintiff.  It is undisputed that the bus engine was running
   at the time Mr. Rios was at the luggage compartment, that it was
17 difficult to make oneself heard, and that the officers and Mr. Rios
   later moved away from the bus.
18    [19]Plaintiff disputes this fact, referring to the same excerpts
   from Ms. Gerardin's deposition discussed in UMF No. 35.  Ms.
19 Gerardin's testimony that the officers were "yelling" at plaintiff
   as he was opening the luggage compartment of the bus in no way
20 contradicts UMF No. 36.
      [20]Plaintiff disputes this fact but does not refer to any
21 evidence in so doing.  Therefore, it is undisputed.
      [21]Plaintiff does not dispute this fact, but asserts that he
22 could not afford such treatment.  In so stating, he refers to a
   page of his deposition that is not included in the excerpts of his
23 deposition attached to Mr. Ruiz's declaration.  However, in
   reviewing the cited portion of his deposition lodged by defendants,
24 plaintiff, when asked if he had ever had x-rays on his hip,
   responded: "Not yet.  I don't got the money to pay for that.  And
25 the doctor is waiting for Medicare to accept it to do so."
   Plaintiff's deposition testimony does not establish that plaintiff
26 did not seek medical attention for his alleged emotional distress

UMF No. 39.  The pain compliance techniques discussed by Myrl Stebens were not appropriate to the circumstances and would not have resulted in quickly gaining control of Mr. Rios, which was the objective.  The techniques suggested by Mr. Stebens may have further escalated an already uncertain situation.

Plaintiff disputes this fact, again relying on Stebens' deposition testimony quoted above in UMF Nos. 31 and 34.

UMF No. 40.  Plaintiff's use of force expert, Myrl Stebens, has no familiarity with the current policies and practices of law enforcement agencies or the training of officers, particularly in the use of a taser.[22]

---

because he could not afford it.

[22]In stating this fact, defendants refer to Stebens' deposition testimony that Stebens could not comment on the Fresno Police Department use of force policies, whether those policies are inconsistent with state and federal standards, or about the training policies or training of the officers because no information concerning these matters had been provided to him. Plaintiff disputes this fact, referring to Stebens' deposition testimony as follows:

> Q.  Do you consider yourself qualified to comment or criticize the policies of a law enforcement agency?
>
> A.  In this particular case, yes.
>
> Q.  And why is that?
>
> A.  Well, because there are, as I pointed out, certain aspects that law enforcement did not use.  You don't have to be a police officer to understand use of force.  You don't have to be a police officer to understand what is appropriate and what is not appropriate.  [¶] There is a right way, and then there the [sic] wrong way, but there is no right way to do the wrong thing, and I think the wrong thing was done, here. [DT 107:7-23]

1        C.  **Claims Pursuant to 42 U.S.C. § 1983**.

2        Defendants move for summary judgment with respect to

3   plaintiff's claims that his federal constitutional rights were

4   violated.

5        1.  **Detention, Warrantless Arrest and Malicious**

6   **Prosecution**.

7        Plaintiff stated at oral argument that he is abandoning any

8   claims that his detention, warrantless arrest and prosecution

9   violated his constitutional rights.

10       Therefore, defendants' motion is GRANTED to the extent that

11   the First Cause of Action alleges unlawful detention, arrest and

12   prosecution in violation of the Fourth Amendment.

13       2.  **Excessive Force**.

14       All claims of excessive force are analyzed under the

15   objective reasonableness standard of the Fourth Amendment set

16   forth in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v.*

17   *Garner*, 471 U.S. 1 (1985).  *Motley v. Parks*, 432 F.3d 1072, 1088

18   (9th Cir.2005).  "Determining whether the force used to

19   effectuate a particular seizure is reasonable under the Fourth

20   Amendment requires a careful balancing of the nature and quality

21   of the intrusion on the individual's Fourth Amendment interests

22   ─────────────────

23   Stebens' testimony does not suffices to create an issue of fact.
    Stebens testified repeatedly that he could not opine about the use

24   of force and training policies of the Fresno Police Department
    and/or relative to state and federal standards.  The testimony

25   relied upon by plaintiff speaks only to the specific incident
    involving Mr. Rios and does not constitute evidence that the

26   policies or customs of the Fresno Police Department were
    unconstitutional under the *Monell* standard.  *See discussion infra*.

                                    20

1   against the countervailing governmental interests at stake."

2   *Graham*, 490 U.S at 396:  This balancing test entails

3   consideration of the totality of the facts and circumstances in

4   the particular case, including "the severity of the crime at

5   issue, whether the suspect poses an immediate threat to the

6   safety of the officers or others, and whether he is actively

7   resisting arrest or attempting to evade arrest by flight."  *Id*.

8   The most important of these factors is the threat posed by the

9   suspect.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.

10  2005).  The "broad discretion that must be afforded to police

11  officers who face a tense situation," must be extended to

12  mistakes of fact concerning "the existence of probable cause" as

13  well as to mistakes as to what the law requires under particular

14  circumstances.  *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir.

15  2001).

16      "The reasonableness of a particular use of force must be

17  judged from the perspective of a reasonable officer on the scene,

18  rather than with the 20/20 vision of hindsight."  *Graham,* 490

19  U.S. at 396.  The "question is whether the officers' actions are

20  'objectively reasonable' in light of the facts and circumstances

21  confronting them, without regard to their underlying intent or

22  motivation."  *Id*. at 397. "The question is not simply whether the

23  force was necessary to accomplish a legitimate police objective;

24  it is whether the force used was reasonable in light of *all* the

25  relevant circumstances."  *Hammer v. Gross*, 932 F.2d 842, 848 (9th

26  Cir.), *cert. denied sub nom. City of Newport Beach, Cal. v.*

*Hammer*, 502 U.S. 980 (1991).  As explained in *Forrester v. City of San Diego*, 25 F.3d 804, 807-808 (9th Cir.1994), *cert. denied*, 513 U.S. 1152 (1995):

> Police officers ... are not required to use the least intrusive degree of force possible. Rather ..., the inquiry is whether the force used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene ... Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.

The court's consideration of whether a particular use of force is reasonable "must make allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a given situation", *Graham*, 490 U.S. at 396-397 (not every push or shove, even if it may later seem unnecessary in hindsight violates the Fourth Amendment).  Proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether he is actively resisting arrest or attempting to evade arrest by flight.

   Defendants assert that the facts demonstrate that plaintiff had been belligerent and uncooperative when detained by the officers, displaying frustration, anger and what was perceived by

the officers to be aggressive posturing.  In attempting to arrest plaintiff, the officers were forced to physically struggle with plaintiff as he pulled his arms away and tucked them in front of him, refusing to be handcuffed.  Officer Campos did not deploy the taser until plaintiff began to physically struggle with the officers.  Plaintiff concedes that he was aware he was being arrested when he told the officers to "go for it" and that he pulled his arm away from the officers when they attempted to handcuff him.  California Penal Code § 835a provides: "If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being arrested by a peace officer, it is the duty of such person to refrain from using force ... to resist such arrest."   The only force used by Officer Manning was to grab plaintiff's arm when attempting to effect the arrest.  Defendants contend that Officer Campos's use of the taser to effectuate plaintiff's arrest was reasonably proportionate to the "difficult, tense and uncertain situation" the officers faced during plaintiff's detention.  Plaintiff does not dispute that the taser represents a modern alternative to other less lethal force options, such as striking techniques, kicks, impact weapons, police service dogs.  Plaintiff's expert concedes that the officers were justified in using force to arrest plaintiff in that the officers could have physically taken plaintiff to the ground, used pepper spray, or a medium baton strike.  Plaintiff's expert only opines that the use of the taser was not necessary because the officers could have used these

1  other force options.  However, police officers are not required

2  to use the least intrusive degree of force possible.  *Forrester*,

3  *supra.*    Defendants contend that the taser provides the ability

4  to quickly control a resisting subject which reduces the

5  probability of a protracted struggle and associated risks to the

6  officers and the suspect.

7       There is a dispute of material fact whether plaintiff

8  resisted arrest in any way and was cooperative as he maintains.

9  The Gerardin testimony offers some support to plaintiff's version

10 of events.  Plaintiff also responds that "there is no question

11 that the severity of the crime (i.e. unsafe lane change) was

12 low", that there are genuine issues "as to whether Defendants

13 reasonably believed that the Plaintiff posed an immediate threat

14 to the officers", and that "the only evidence presented by

15 Defendants are their own respective self-serving testimonials

16 alleging that Plaintiff appeared to be ready to confront the

17 Defendants in a stand up struggle".  Plaintiff further contends

18 that "even if the Defendants had probable cause to believe a

19 crime had been committed in their presence, this does not give

20 them *carte blanche* to inflict more pain than is necessary to make

21 an arrest."

22      Under the totality of the circumstances, although the

23 officers were not required to use the least amount of force to

24 arrest plaintiff, there is evidence that plaintiff was

25 considerably smaller that the officers.  Two expert opinions vary

26 that a reasonable officer would not have used the taser in view

1  of the officers' size and stature and should have simply taken

2  plaintiff down.  If reasonable minds can differ whether a taser

3  should have been employed or whether any force should have been

4  employed, the dispute cannot be resolved as a matter of law.

5      Defendants motion for summary judgment on the excessive

6  force claim is DENIED.

7              3.  **Equal Protection**.

8      Defendants move for summary judgment to the extent that the

9  Complaint alleges plaintiff's arrest and prosecution denied his

10 right to equal protection of the laws under the Fourteenth

11 Amendment.

12     "To succeed on a § 1983 equal protection claim, the

13 plaintiffs must prove that the defendants acted in a

14 discriminatory manner and that the discrimination was

15 intentional."  *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d

16 736, 739 (9th Cir.2000).  *See also Draper v. Reynolds*, 369 F.3d

17 1270, 1278 n.14 (9th Cir.), *cert. denied*, 543 U.S. 988 (2004)("To

18 state an equal protection claim, [plaintiff] must allege that

19 'through state action, similarly situated persons have been

20 treated disparately' ... and put forth evidence that

21 [defendant's] actions were motivated by race.")

22     No evidence has been disclosed from which it may be inferred

23 that either officer discriminated against plaintiff or that

24 similarly situated persons have been treated disparately.

25 Plaintiff did not respond to this ground for summary judgment in

26 opposing the motion and did not present any evidence or argument

                            25

in support of this claim at the hearing.  Consequently, summary judgment is GRANTED with respect to this claim.

### 4. Conspiracy.

Defendants move for summary judgment to the extent that Complaint alleges that Officers Campos and Manning and the City of Fresno conspired to violate plaintiff's constitutional rights. Because plaintiff concedes that the officers had probable cause to detain and arrest plaintiff, the only basis for the conspiracy claim is that the officers conspired to use excessive force in arresting plaintiff in violation of the Fourth Amendment.

To prove a conspiracy under section 1983, plaintiff must concrete evidence showing an agreement or meeting of the minds to violate constitutional rights.  To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. *Radcliffe v. Rainbow Const. Co.,* 254 F.3d 772, 782 (9th Cir.2001), *cert. denied*, 534 U.S. 1020 (2001), citing *United Steelworkers of America v. Phelps Dodge Corporation*, 865 F.3d 1539, 1540-1541 (9th Cir.), *cert. denied*, 493 U.S. 809 (1989).

Assuming arguendo that either officer violated plaintiff's Fourth Amendment rights by the use of excessive force, defendants argue that there is no evidence of an agreement or a meeting of the minds between Officers Campos and Manning to do so. Defendants note that Mr. Rios testified that Officer Manning made no statements to Officer Campos during the encounter.  Defendants contend that "[w]ithout communication there can be no agreement

or meeting of the minds."

In opposing this ground for summary judgment, plaintiff cites California opinions: *Black v. Sullivan*, 48 Cal.App.3d 557, 567 (1975), that "[i]t is not necessary that the plaintiffs produce evidence showing that the defendants met and actually agreed to undertake the performance of unlawful acts" and *Chicago Title Ins. Co. v. Great Western Financial Corp.*, 69 Cal.2d 305, 316 (1968) that "[t]he conspiracy 'may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances'". Plaintiff also cites *Weatherton v. Growers Farm Labor Assn.*, 275 Cal.App.2d 168, 176 (1969):

> Liability as a co-conspirator depends upon projected joint action. 'The mere knowledge, acquiescence, or approval of the act, without co-operation or agreement to co-operate is not enough ...' ... But once the plan for joint action is shown, 'a defendant may be held liable who in fact committed no overt act and gained no benefit therefrom.' ....

Relying on these principles, plaintiff that there is evidence to support his conspiracy claim:

> Here Defendants were on patrol together, as they had been in the past.  Both are much bigger in stature than Plaintiff.  Both easily could have arrested Plaintiff without having to taser him.  But instead they agreed that they would deprive Plaintiff's right to be free from an unreasonable search and seizure.  Furthermore, they later attempted to justify their use of force by creating a corroborating account, between themselves, of why Plaintiff deserved to be tazed [sic]: i) that Plaintiff clenched his fists, rocked back and forth, and challenged the Defendants to a fight, ii) and that as Defendants tried

27

> to handcuff him he pulled away, or stiffened
> his arm.  The Plaintiffs [sic] and
> Defendants' respective accounts of what
> happened at that moment (i.e [sic]
> immediately prior to the tazing [sic]) is the
> material in dispute.

The cases upon which plaintiff relies are factually distinguishable.  In *Black*, which involved an alleged conspiracy among several defendants to interfere with and prevent the closing of an escrow and sale of the property by willfully failing to prepare and deliver a required beneficiary statement, the court held that an issue of fact was demonstrated by the conduct of the defendants and from documents admitted into evidence that the defendants were working in concert to prevent the sale and to regain the property because it had increased in value.  Plaintiff has offered no evidence that the officers "had any kind of personal interest in depriving Plaintiff of his constitutional rights."  *Chicago Title Company,* is distinguishable because plaintiff "has failed to show that both officers had a common plan, scheme and design to interfere with Plaintiff's constitutional rights for some personal interest, as did the defendants in the Chicago Title Company case." Furthermore, plaintiff has failed to show any evidence that the officers entered into an agreement to use excessive force in arresting plaintiff.

The fact that the officers patrol together and are physically bigger than plaintiff cannot provide an inference that these officers conspired to arrest plaintiff with the use of

excessive force.  Furthermore, the contention that a conspiracy to arrest plaintiff by the use of excessive force may be inferred from the fact that the officers' post-arrest reports are consistent and contradict plaintiff's version of events is not material or probative.  The agreement had to arise before the use of the taser.  Here, the record establishes that the officers did not even know about Mr. Rios until a citizen reported that the driver of a bus had been driving recklessly, minutes before their encounter.  There is no evidence from which it may be inferred that the officers agreed to use the taser before they approached Mr. Rios at the luggage compartment of the bus or that Officer Manning discussed or had any advance knowledge that Officer Campos was going to deploy the taser.  Mr. Rios concedes that Officer Manning made no statements to Officer Campos during the encounter.  Plaintiff has not provided "concrete evidence showing an agreement or meeting of the minds to violate constitutional rights."[23]

Defendants' motion is GRANTED to the extent that plaintiff contends that Officers Campos and Manning and the City of Fresno conspired to use excessive force in arresting plaintiff.

_____

[23]Although an officer has a duty to intervene when a fellow officer violates the constitutional rights of a suspect or citizen, *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996), an officer can be held liable for failing to intercede only if the officer had a realistic opportunity to intercede, *Cunningham v. Gates*, 229 F.3d 1271, 1289-1290 (9th Cir.2000).  Here, plaintiff has not alleged and presents no evidence that Officer Manning had advance knowledge and a realistic opportunity to intervene to prevent Officer Campos' use of the taser.

1          5.   **Monell Claim**.

2     *Monell v. New York City Dept. of Social Services*, 436 U.S.

3 658 (1978) authorizes direct suits against local government units

4 under Section 1983 where "the action that is alleged to be

5 unconstitutional implements or executes a policy statement,

6 ordinance, regulation, or decision officially adopted and

7 promulgated by that body's officers."  436 at 690-691.

8 "Moreover, ... local governments ... may be sued for

9 constitutional deprivations visited pursuant to governmental

10 'custom' even though such a custom has not received formal

11 approval through the body's official decisionmaking channels."

12 *Id.*  Since "Congress did not intend municipalities to be held

13 liable unless action pursuant to official municipal policy of

14 some nature caused a constitutional tort[,] ... a municipality

15 cannot be held labile solely because it employs a tortfesor - or,

16 in other words, a municipality cannot be held liable under § 1983

17 on a respondeat superior theory."  *Id.* at 691.  A municipality

18 will be liable under Section 1983 only if "the municipality

19 itself causes the constitutional violation at issue."  *Canton v.*

20 *Harris*, 489 U.S. 378, 385 (1989).  In order to assert a *Monell*

21 claim, plaintiff must establish: (1) a violation of

22 constitutional rights occurred; (2) the existence of a municipal

23 policy or custom; and (3) a causal nexus between (1) and (2).

24 *Canton, id.* at 385-386; *see also City of Los Angeles v. Heller*,

25 475 U.S. 796, 799 (1986)("If a person has suffered no

26 constitutional injury at the hands of the individual police

1  officer, the fact that the departmental regulations might have

2  authorized the use of constitutionally excessive force is quite

3  beside the point.").

4       The Second Amended Complaint alleges in pertinent part:

5            43.  Defendant City of Fresno and DOE ONE,
             the supervisory officers or agents of the
6            CITY OF FRESNO, are directly liable and
             responsible for the acts of Defendants CAMPOS
7            and MANNING, because Defendant CAMPOS took
             the action of tazering Plaintiff pursuant to
8            governmental custom.

9            44.  Plaintiff alleges that it is the custom
             of Fresno Police Officers, including
10           Defendant Campos, to resort to the use of a
             tazer gun, even when the totality of the
11           circumstances do not warrant said use.

12           45.  Plaintiff also alleges that Fresno
             Police Officers including Defendant Campos,
13           resort to the use of a tazer gun, when force
             is applied, in nearly half of the reported
14           incidences involving use of force.  The use
             of the tazer guns is by far the most commonly
15           used instrument involved in the use of force.

16      Defendants move for summary judgment on the ground that

17  there is no evidence of a policy or custom of "resorting to the

18  use of the taser" when circumstances do not warrant it as alleged

19  in the Second Amended Complaint.

20      In opposing this aspect of the motion for summary judgment,

21  plaintiff argues as follows:

22           The argument here is simply that the person
             causing the violation, namely the Defendants,
23           maybe subordinates, but that there [sic]
             actions are 'ratified' by one with final
24           policymaking authority, namely Chief Dyer.
             The determination of who has final
25           policymaking authority is a question of law
             for the court to decide, not the jury ... In
26           this instant case, Plaintiff argues that

                                  31

1      there should be municipal liability because
       of the actions of the City's final
2      policymaker, Chief of Police Jerry Dyer.  It
       is Plaintiff's contention that Chief Dyer
3      acted with deliberate indifference to the
       violation of Plaintiff's Fourth Amendment
4      rights in approving an internal affairs
       investigations [sic] against Defendant Rios
5      [sic], that were clearly deficient, and that
       Chief Dyer thereby ratified the violations.
6      In this case, Chief Dyer' [sic] has provided
       (in lieu of our 'Pitches' [sic] motion during
7      the criminal trial of Plaintiff), 'the
       information found to discoverable' [sic]
8      consisting of the names, addresses and phone
       numbers of those individuals who have alleged
9      constitutional violations and/or deprivations
       at the hands of Defendant Campos (The
10     protective order on file is attached hereto
       as Exhibit A).  In those cases, Chief Dyer
11     found the complainants' allegations to be
       'unfounded' and 'not sustain[able]'.  (See
12     Exhibit A).  A municipality can be liable for
       an isolated constitutional violation if the
13     final policymaker 'ratified' a subordinate's
       action ... The City of Fresno also rejected
14     Plaintiff's claim (See Exhibit B).
       Furthermore, according to the Fresno Police
15     Department's own reportable use of force
       data, electronic immobilization devices, like
16     the one used by Defendant Campos, are 42%
       more likely to be used than pepper spray.
17     (See Exhibit B).  Clearly the use of taser
       has been ratified, but it has also become the
18     weapon of choice when taking a suspect into
       custody.  In this case the Plaintiff was
19     taken to the hospital and then released.

20     "A municipality ... can be liable for an isolated

21  constitutional violation if the final policymaker 'ratified' a

22  subordinate's action."  *Christie v. Topa*, 176 F.3d 1231, 1238

23  (9th Cir.), *cert. denied sub nom. County of Hawaii v. Anderson*,

24  528 U.S. 928 (1999).  "To show ratification, a plaintiff must

25  prove that the 'authorized policymakers approve a subordinate's

26  decision and the basis for it.'"  *Christie*, *id.* at 1239 *quoting*

                                    32

*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  As explained in *Gillette v. Delmore*, 979 F.2d 1342, 1347-1348 (9th Cir.1992), *cert. denied*, 510 U.S. 932 (1993).  In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-481 (1986), the Supreme Court held that a single decision by a municipal policymaker may be sufficient to trigger Section 1983 liability under *Monell*. "There must, however, be evidence of a conscious, affirmative choice.  Municipal liability under section 1983 attaches only where 'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with the respect to the subject matter in question.'" *Gillette*, *id.* at 1347, *quoting Pembaur, id.* at 483-484.  In *Gillette*, the plaintiff argued that the failure of the City Manager to countermand the Fire Chief's final decision to terminate Gillette and to object to the hiring of counsel to represent the City in the arbitration of plaintiff's grievance, ratified the Fire Chief's decision and effectively made employment policy.  In so arguing, Gillette relied on the statement in *Praprotnik*, *id.* 485 U.S. at 127, that "[i]f the authorized policymakers approve a subordinates decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  The Ninth Circuit rejected this contention:

> The cases make clear that the unconstitutional discretionary actions of municipal employees generally are not chargeable to the municipality under section 1983.  *See Praprotnik*, 485 U.S. at 126 ...

33

(observing that '[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.').  In *Praprotnik*, the Court considered whether a policymaker's deferential review of a subordinate's discretionary decision constituted a delegation of policy-making authority.  The plurality concluded that there was no delegation and thus no basis for section 1983 liability, but observed that it would be a different case 'if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker ... [or] if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware.'  *Id.* at 130 ....

Gillette's evidence is not sufficient under *Pembaur* or *Praprotnik* to establish section 1983 liability based on the City Manager's alleged acquiescence in Gillette's termination.  *Pembaur* requires that an official policymaker make a deliberate choice from among various alternatives to follow a particular course of action ... Likewise, *Praprotnik* requires that a policymaker approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision.

...

At most, Gillette established that the City Manager did not overrule a discretionary decision by the Fire Chief and did not object to the retention of counsel to represent the City in an arbitration proceeding pursuant to a collective bargaining agreement.  The Fire Chief did not cast his decision to discipline Gillette in the form of a policy statement, and the City Manager's testimony that he did not object to hiring counsel for Gillette's arbitration is at least equally consistent with a general policy of routinely hiring lawyers to defend the City in all litigation or labor grievance proceedings.  There is no

34

1          evidence that the City Manager made a
           deliberate choice to endorse the Fire Chief's
2          decision and the basis for it.

3          The fact that the City Manager did not
           overrule the Fire Chief in this instance thus
4          cannot form the basis of municipal liability
           under section 1983.  To hold cities liable
5          under section 1983 whenever policymakers fail
           to overrule the unconstitutional
6          discretionary acts of subordinates would
           simply smuggle *respondeat superior* liability
7          into section 1983 law under the guise of
           *Pembaur's* 'single decision' rule.  We decline
8          to endorse this end run around *Monell*.

9  *Id.* at 1348.  *See also Christie*, *id.,* 176 F.3d at 1239:

10         A policymaker's knowledge of an
           unconstitutional act does not, by itself,
11         constitute ratification.  Instead, a
           plaintiff must prove that the policymaker
12         approved of the subordinate's act.  For
           example, it is well-settled that a
13         policymaker's mere refusal to overrule a
           subordinate's completed act does not
14         constitute approval.

15     Exhibit A referred to by plaintiff is a copy of a letter

16  dated September 27, 2004 to Mr. Ruiz from Deputy City Attorney

17  James D. Miller regarding *People v. Angel Rios*, Fresno County

18  Superior Court Case No. M04913169-9, which letter states:

19         Enclosed herewith is the information found to
           be discoverable in the *Pitchess* motion held
20         on Friday, September 24, 2004, in the above-
           entitled matter, consisting, in part, of the
21         names, addresses and phone numbers of
           involved parties in Fresno Police Department
22         Internal Affairs Cases Nos. 20000093 and
           2002140.
23
           Also please be reminded that the Protective
24         Order on file with the court prohibits
           duplication of these materials.  Accordingly,
25         upon completion of these proceedings, all
           material provided herein must be returned to
26         the Fresno Police Department.

35

1    Exhibit A also includes a copy of the notification dated

2    September 3, 2004  from the City of Fresno that plaintiff's tort

3    claim was rejected by operation of law on August 6, 2004.

4    Exhibit B is document entitled "Fresno Police Department

5    Reportable Use of Force Project" for October, November and

6    December 2003 which has attached to it a pie chart showing the

7    percentages of types of force used by police officers during that

8    time period.   The pie chart shows that the taser (referred to as

9    "electronic immobilization device) was used 37.4%; body strike

10   was used 28.1%; K-9 was used 13.4%; pepper spray was used 7.6%;

11   "projected impact weapon" was used 5.6%; baton was used 5.0%;

12   "object strike" was used 1.4%; firearm was used 1.2%; and vehicle

13   was used 0.3%.

14        Plaintiff's attempt to base *Monell* liability on Chief Dyer's

15   ratification of the defendant officers' conduct is not alleged in

16   the Second Amended Complaint.   Chief Dyer is not named as a

17   defendant in this action.   The Scheduling Order filed on

18   September 27, 2005 states in pertinent part:

19                Plaintiff ... contends that the City of
                  Fresno is liable and responsible for the acts
20                of Officers Campos and Manning, because the
                  City took the action of tazering [sic]
21                plaintiff pursuant to governmental custom.
                  Plaintiff alleges that it is the custom of
22                Fresno Police Officers, including Officers
                  Campos and Manning, to resort to the use of a
23                tazer [sic] gun, even when the totality of
                  the circumstances do not warrant said use.
24
                  When force is applied, Fresno Police
25                Department Officers, in nearly half of the
                  reported incidences involving use of force,
26                resort to the use of a tazer [sic] gun.   The

                                36

1        use of the tazer [sic] gun is by far the most
         commonly used instrument involving the use of
2        force.  Despite the tazer gun's extensive
         use, the City failed, and continues to fail,
3        to properly train Officers Campos and
         Manning, and officers of the Fresno Police
4        Department in the use

5    The Second Amended Complaint alleges at Paragraph 9 that

6  "Plaintiff reserves the right to amend this Complaint to conform

7  to proof adduced at trial upon oral motion to the Court."

8       Plaintiff has made no such request to amend in opposing the

9  motion for summary judgment nor did he make such request at oral

10 argument.  However, even if such request had been made, it would

11 be denied.  Rule 15(a), Federal Rules of Civil Procedure,

12 provides that "leave [to amend] shall be freely given when

13 justice so requires."  "The purpose of pleading is 'to facilitate

14 a proper decision on the merits' ... and not erect formal and

15 burdensome impediments to the litigation process.  Unless undue

16 prejudice to the opposing party will result, a trial judge should

17 ordinarily permit a party to amend its complaint."  *Howey v.*

18 *United States*, 481 F.2d 1187, 1990 (1973).  However, "[t]his

19 strong policy toward permitting the amendment of pleadings ...

20 must be tempered with considerations of 'undue delay, bad faith

21 or dilatory motive on the part of the movant, repeated failure to

22 cure deficiencies by amendments previously allowed, undue

23 prejudice to the opposing party by virtue of allowance of the

24 amendment, futility of amendment, etc.'  *Foman v. Davis*, 371 U.S.

25 178, 182 ... (1962)."  *Schlacter-Jones*, 936 F.2d 455, 443 (9th

26 Cir. 1991).  Denial of leave to amend is not an abuse of

                                   37

1  discretion when the motion for leave to amend is an attempt to

2  avoid pending summary judgment.  *See Schlacter-Jones, id.*, 936

3  F.2d at 443 ("A motion for leave to amend is not a vehicle to

4  circumvent summary judgment") and cases cited therein.

5      Here, plaintiff does not contradict defendants' assertion

6  that no discovery was conducted by plaintiff that in any way

7  infers that there is any basis for the complaints referenced or

8  that findings made in relation to those complaints were

9  inappropriate under the totality of the investigation conducted.

10  Therefore, leave to amend will result in undue delay.

11  Furthermore, it is clear from the record that leave to amend

12  would be made in an attempt to avoid summary judgment for the

13  City of Fresno on the *Monell* claim.

14      Furthermore, the evidence submitted by plaintiff in

15  opposition to the motion for summary judgment is not relevant or

16  probative.  A letter submitted by the City Attorney's Office in

17  response to an order following a *Pitchess* motion does not provide

18  a basis for liability against the City of Fresno.[24]  The letter

19  rejecting plaintiff's tort claim cannot provide a basis for

20  finding that the City of Fresno ratified unconstitutional

21  conduct.  Ratification by Chief Dyer based on what plaintiff

22  characterizes in his brief as "clearly deficient" internal

23

24      [24]A *Pitchess* motion, based on *Pitchess v. Superior Court*, 11
Cal.3d 531 (1974), involves discovery in a criminal case of police
25  personnel records.  This discovery is now governed by various
statutes.  *See City of San Jose v. Superior Court*, 5 Cal.4th 47
26  (1993).

38

affairs investigations is not alleged in the Second Amended
Complaint and is not supported by any evidence submitted by
plaintiff.  The letter provided by the City Attorney in the
criminal action against Mr. Rios provides no specifics of the
claims made against Officer Campos or the details of the internal
investigation.  Plaintiff nowhere sets forth facts upon which he
relies in contending that these investigations were "clearly
deficient."  The rejection of plaintiff's tort claim by the City
of Fresno simply does not constitute evidence that Chief Dyer
ratified the alleged use of excessive force.  There is no
evidence before the court that Chief Dyer participated in the
internal affairs investigation resulting from this incident.

Accordingly, summary judgment for defendants is GRANTED with
respect to plaintiff's claim against the City of Fresno pursuant
to *Monell v. New York City Dept. of Social Services*.

**6.  Qualified Immunity.**

Qualified immunity serves to shield government officials
"from liability for civil damages insofar as their conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known." *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982).  The Ninth Circuit employs
a three-part test to determine whether an individual is entitled
to qualified immunity.  First, the specific right allegedly
violated must be identified.  Secondly, it must be determined
whether that right was so clearly established as to alert a
reasonable officer to its constitutional parameters.  Third, if

1 the law is clearly established, it must be determined whether a

2 reasonable officer could have believed lawful the particular

3 conduct at issue. *Kelly v. Borg*, 60 F.3d 664, 666 (9th Cir.

4 1995). The plaintiff in a Section 1983 action bears the burden

5 of proving that the right allegedly violated was clearly

6 established at the time of the officer's allegedly impermissible

7 conduct. *Camarillo v. McCarthy*, 998 F.2d 638, 640 (9th Cir.

8 1993). A law is "clearly established" when "the contours of that

9 right [are] sufficiently clear that a reasonable officer would

10 understand that what he is doing violates that right." *Anderson*

11 *v. Creighton*, 489 U.S. 635, 640 (1987). To demonstrate clearly

12 established law at the time of the events in question, the

13 plaintiff

14          'must show that <u>the particular facts</u> of [the]
          case support a claim of clearly established
15          right.' ... This does not mean that the
          'exact factual situation' of [the case] must
16          have been previously litigated ...
          '[S]pecific binding precedent is not required
17          to show that a right is clearly established
          for qualified immunity purposes.' ... Absent
18          binding precedent, 'a court should look at
          all available decisional law including
19          decisions of state courts, other circuits,
          and district courts to determine whether the
20          right was clearly established.' ...
          Nonetheless, '[t]he contours of the [clearly
21          established] right must be sufficiently clear
          that a reasonable official would understand
22          that what he is doing violates that right.'
          ....

23 *Doe By and Through Doe v. Petaluma City School Dist.*, 54 F.3d

24 1447, 1450 (9th Cir. 1995). The Supreme Court has set forth a

25 two-pronged inquiry to resolve all qualified immunity claims.

26

First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.  However, if the court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established."  *Id*.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.  This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case.  *Id*. at 201.  Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces.  If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable.  If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense."  *Id*. at 205.  In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from

41

suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201. As we previously said in this very context:

> '[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.' ... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' ...

The Court of Appeals acknowledged this statement of law, but then proceeded to find

42

1                  fair warning in the general tests set out in
*Graham* and *Garner* ... In so doing, it was
2                  mistaken.  *Graham* and *Garner,* following the
lead of the Fourth Amendment's text, are cast
3                  at a high level of generality.  See *Graham v.
Connor*, *supra*, at 396 ('"[T]he test of
4                  reasonableness under the Fourth Amendment is
not capable of precise definition or
5                  mechanical application"').  Of course, in an
obvious case, these standards can 'clearly
6                  establish' the answer, even without a body of
relevant case law.'

7

543 U.S. at 198-199.

8

9        Defendant Officer Campos is not entitled to summary judgment

10 on the issue of qualified immunity.  Although plaintiff's main

11 complaint is that a less painful force option should have been

12 used to effectuate his arrest and, as held in *Forrester, supra*,

13 there is no constitutional requirement that an officer use the

14 least intrusive force option, the facts underlying the decision

15 to use force to effect plaintiff's arrest are disputed.  A

16 reasonable jury, if it accepts plaintiff's version of the events,

17 could find that the decision by Campos to use any force to effect

18 the arrest violated the excessive force clause of the Fourth

19 Amendment.   Furthermore, as discussed above, there is no

20 evidence that Officer Manning deployed the taser, conspired to do

21 so, or failed to intervene to prevent the use of the taser,

22 having a realistic opportunity to do so.

23        Accordingly, summary judgment for defendant Manning on the

24 ground of qualified immunity is GRANTED.  As to defendant Campos,

25 the motion is DENIED.

26      **D.   Claims Pursuant to California Civil Code §§ 43, 51 and**

1    **52.1**.

2        The Second Amended Complaint contains numerous allegations

3    in the First, Second, Third and Fourth Causes of Action that

4    defendants violated California Civil Code §§ 43, 51, 51.7 and

5    52.1.[25]   Civil Code § 43 provides in pertinent part:

6                  Besides the personal rights mentioned or
                   recognized in the Government Code, every
7                  person has, subject to the qualifications and
                   restrictions provided by law, the right to
8                  protection from bodily restraint or harm,
                   from personal insult, from defamation, and
9                  from injury to his personal reputation.

10   Civil Code § 51, also known as the Unruh Civil Rights Act,

11   provides in pertinent part:

12                 (b) All persons within the jurisdiction of
                   this state are free and equal, and no matter
13                 what their sex, race, color, religion,
                   ancestry, national origin, disability,
14                 medical condition, marital status, or sexual
                   orientation, are entitled to full and equal
15                 accommodations, advantages, facilities,
                   privileges, or services in all business
16                 establishments of every kind whatsoever.

17   Civil Code § 51.7(a) provides in pertinent part that "[a]ll

18   persons within the jurisdiction of this state have the right to

19   be free from any violence, or intimidation by threat of violence,

20   committed against their persons ... on account of any

21   characteristic defined in subdivision (b) .. of Section 51 ... or

22   because another person perceives them to have one or more of

23   those characteristics."   Civil Code § 52.1 provides in pertinent

24   part:

25   ────────────────────

26        [25]The First Cause of Action alleges a violation of Civil Code
     § 52.7, which is not mentioned by defendants.

(a) If a person or persons, whether or not acting under color of state law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual ... of rights secured by the Constitution or laws of the United States, the Attorney General, or any district attorney or city attorney may bring a civil action .....

(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his ... own name and on his ... own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

"Section 52.1 does not provide any substantive protections; instead, it enables individuals to sue for damages as a result of constitutional violations." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir.1996). In *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 843 (2004), the California Supreme Court held "[i]n pursuing relief for their constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion."

Plaintiff has limited his federal constitutional claim to excessive force in violation of the Fourth Amendment. Summary judgment for defendants is granted with respect to these state

1  law statutory claims.  With regard to Section 51 and 51.7, there
2  is no evidence from which it may be inferred that defendants
3  acted against plaintiff unlawfully because of his race or
4  national origin.  Furthermore, with regard to each of the
5  statutory claims, there is no evidence that any defendant
6  attempted to interfere with a specific constitutional right by
7  threats, intimidation or coercion, or by committing or
8  threatening to commit a violent act against plaintiff or that
9  plaintiff reasonably believed that if he exercised a specific
10 constitutional right, defendants would commit violence against
11 him.

12      Therefore, summary judgment for defendants is GRANTED with
13 respect to the claims in the First, Second, Third and Fourth
14 Causes of Action that defendants violated California Civil Code
15 §§ 43, 51, 51.7 and 52.1.

16      **E.   Intentional Infliction of Emotional Distress**.

17      Because plaintiff conceded summary judgment for defendants
18 at oral argument with respect to the Fourth Cause of Action for
19 intentional infliction of emotional distress, defendants' motion
20 is GRANTED.

21      **F.   Negligence Per Se**.

22      The Fifth Cause of Action, captioned "negligence per se,"
23 alleges that defendants "owed a duty of care to Plaintiff, not to
24 falsely arrest and imprison him as Set forth in the Fourth
25 Amendment ..., Article One, Sections One and Seven of the
26 California Constitution, and California Civil Code ... § 43 and §

46

52.1" and that the alleged conduct of defendants "constitutes
negligence per se ... in that Defendants ... breached the
statutory standards set forth" in these constitutional and
statutory provisions.

Defendants' motion is GRANTED. "'Negligence per se' is an
evidentiary doctrine codified at Evidence Code section 669.
Under subdivision (a) of this section, the doctrine creates a
presumption of negligence if four elements are established: (1)
the defendant violated a statute, ordinance, or regulation of a
public entity; (2) the violation proximately caused death or
injury to person or property; (3) the death or injury resulted
from an occurrence the nature of which the statute, ordinance, or
regulation was designed to prevent; and (4) the person suffering
the death or injury to his person or property was one of the
class of persons for whose protection the statute, ordinance, or
regulation was adopted." *Quiroz v. Seventh Ave. Center*, 140
Cal.App.4th 1256, 1285 (2006). "[T]he doctrine of negligence per
se does not establish tort liability. Rather, it merely codifies
the rule that a presumption of negligence arises from the
violation of a statute which was enacted to protect a class of
persons of which the plaintiff is a member against the type of
harm that the plaintiff suffered as a result of the violation."
*Id.* "Even if the four requirements of Evidence code section 669,
subdivision (a), are satisfied, this alone does not entitle a
plaintiff to a presumption of negligence *in the absence of an
underlying negligence action*." *Id.*

**G.   Sixth Cause of Action for Negligent Infliction of Emotional Distress and Negligence and Eighth Cause of Action for Negligence.**

Defendants move for summary judgment on the Sixth Cause of Action for negligent infliction of emotional distress.

There is no independent tort of negligent infliction of emotional distress.  *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 984 (1993).  Rather, the tort is negligence.  *Id.*

The facts set forth above establish as a matter of law that the defendants did not act negligently in using force to arrest plaintiff.  Therefore, defendants' motion is GRANTED.

**H.   Seventh Cause of Action for Assault and Battery.**

Defendants move for summary judgment with respect to this cause of action.

"In order to prevail on a claim of battery against a police officer, the plaintiff bears the burden of proving the officer used unreasonable force ... 'A police in California may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance. (Pen. Code, § 835a.).  The standard jury instruction in police battery actions recognize this: "A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force."(BAJI No. 7.54).' ...."  *Munoz*, *supra*, 120 Cal.App.4th at 1102.

Therefore, because defendants are not entitled summary

48

judgment on plaintiff's claim of excessive force in violation of the Fourth Amendment, *see discussion supra*, defendants' motion is DENIED.

**I. <u>Punitive Damages</u>.**

The Second Amended Complaint prays for exemplary or punitive damages against Officers Campos and Manning in connection with each of the causes of action alleged against them in the Second Amended Complaint.

Punitive damages may be assessed in a Section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Under California law, punitive damages are allowed if the plaintiff "has proved by clear and convincing evidence that [the named defendant] engaged in that conduct with malice, oppression, or fraud." CACI 3941. "'Malice' means that [the named defendant] acted with into to cause injury or that [the named defendant's] conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.' *Id.* "'Oppression' means that [the named defendant]'s conduct was despicable and subjected [the plaintiff] to cruel and unjust hardship in knowing disregard of [his] rights." *Id.* "'Despicable conduct' is conduct that is so

1   vile, base, or contemptible that it would be looked down on and

2   despised by reasonable people."   *Id.*

3       Defendants move for summary judgment in favor of the

4   defendant officers, contending that there is no evidence

5   presented which would support an award of punitive damages.

6       Plaintiff responds that defendant Campos "purposefully tazed

7   Plaintiff", that the use of the taser was unreasonable, and that

8   plaintiff "has presented evidence to support that Defendants

9   displayed callous indifference to Plaintiff."

10      Plaintiff has presented no evidence which would justify an

11  award of punitive damages against Officer Manning.

12      Because the use of the taser by Officer Campos arguably

13  constitutes excessive force in violation of the Fourth Amendment

14  and state tort law, there is a question of fact whether his use

15  of the taser was motivated by evil motive or intent or was in

16  reckless or callous indifference to the Fourth Amendment rights

17  of plaintiff.

18      ACCORDINGLY, as set forth above:

19      1.  Defendants' motion for summary judgment is GRANTED as to

20  all defendants as to all claims, except, as to defendant Campos,

21  individually, for the First Cause of Action for excessive force

22  in violation of the Fourth Amendment and the Seventh Cause of

23  Action for battery under state law.

24      2.  Defendants' motion for summary judgment as to the prayer

25  for punitive damages is GRANTED with respect to all defendants,

26  except it is DENIED with respect to defendant Campos as to the

50

1   First Cause of Action for excessive force and the Seventh Cause

2   of Action for battery under state law.

3        3.   Pretrial conference is scheduled for Monday, November

4   20, 2006 at 11:00 a.m. in Courtroom 3.

5        IT IS SO ORDERED.

6   **Dated:    November 14, 2006**            **/s/ Oliver W. Wanger**
    668554                               UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26